**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| Roy Thomas Latimer, Jr., | ) | Case No.: 11-00223-BGC7 |
| | ) | |
| Debtor. | ) | |
| | | |
| Second Avenue Holdings, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | AP No.: 11-00432-BGC |
| | ) | |
| Roy Thomas Latimer, Jr., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

The matter before the Court is the <u>Motion to Compel Arbitration and Stay Adversary Proceeding</u> (A.P. Doc. No. 27) filed on April 3, 2012 by the defendant, Roy Thomas Latimer, Jr. After notice, a hearing was held on May 23, 2012. Appearing were: Brenton K. Morris and Frederick Mott Garfield, attorneys for the defendant; and Bradley Richard Hightower, the attorney for the plaintiff, Second Avenue Holdings, LLC. The matter was submitted on the record in this case and the arguments and briefs of counsel.

**I. FINDINGS OF FACTS**

1. The debtor, Mr. Latimer, is the managing member and owns membership interests in a limited liability company known as Goodall-Brown Management, LLC. ("GBM"). GBM is the general partner of Goodall-Brown Associates, LP ("GBA").

2. On December 31, 2001, GBA obtained a loan in the amount of $2,975,000 from a lender named "The Bank" to use for construction to convert a commercial building know as the Goodall Brown Building into loft apartments and retail space.

3. Three documents were executed with respect to the loan: (1) a promissory note; (2) a "Future Advance Mortgage, Assignment of Rents and Leases and Security Agreement," which provides security for repayment of the amounts loaned; and (3) a "Construction Loan Agreement," which dictates how and when the funds would be

distributed to GBA and defines what events constitute defaults under the note. A.P. Doc. No. 1, Exhibits A, B, & C.

4. Mr. Latimer executed the note, and the construction loan agreement, and the security agreement on behalf of GBA in his representative capacity as manager of GBM, GBA's general partner. Mr. Latimer, along with several other individuals, also personally guaranteed repayment of the loan. Those other individuals were eventually released from their guarantees.

5. The note provides for interest only payments until October 31, 2003 (the "Construction Maturity Date"), and after that date, for monthly principal and interest payments until October 31, 2004 (the "Term Maturity Date"), on which date GBA had the option to either pay the balance due in full or extend the term of the loan until October 31, 2006 (the "Extended Term Maturity Date"). Through a series of amendments to the note, the "Construction Maturity Date" was extended to June 30, 2004, and the "Extended Term Maturity Date" was ultimately extended to August 5, 2013. The last and eighth amendment to the note was executed on August 5, 2010.

6. To secure payment of amounts due under the note, GBA, in the "Future Advance Mortgage, Assignment of Rents and Leases and Security Agreement," in addition to conveying the property to the lender, also assigned to the lender all leases of the property, or any part thereof, that it had entered into or might otherwise enter into in the future, as well as all rents which might accrue or be produced by virtue of any such rental of the property. The document specifically forbad GBA from collecting more than one month's rent in advance from any tenant and from waiving, releasing, reducing, discounting, discharging or compromising the payment of any of the rents that might accrue or had accrued for any portion of the property.

7. On October 1, 2005, GBA leased the entire property to Sloss Real Estate Group, Inc. ("SREG"). The lease was to run until September 30, 2037. The rent for the first year of the lease was an amount equal to the annual debt service on the property. The annual rent for the two years after that was an amount equal to the lesser of the annual debt service or $25,000 per month. The annual rent for the remaining term of the lease was to be an amount equal to 150% of the annual debt service.

8. The lease provided the lessee with the option to purchase the property after January 31, 2008. The lessee was required to pay the lessor $4,700,000 for the property if it should elect to exercise the option before August 30, 2008. After that date, the option price would be the greater of $4,700,000 or the fair market value of the property as determined by appraisal.

9. The lease requires any and all disputes between the lessor and the lessee concerning the lease to be resolved through binding arbitration administered by the American Arbitration Association. The dispute resolution provision reads:

13.1.2. Dispute Resolution. The parties recognize that disputes may arise in the future concerning this Lease (a "Dispute"). Therefore, the parties shall resolve any and all such Disputes of any nature whatsoever in the following manner:

13.1.2.1 Negotiation. In the event of a Dispute, the parties shall attempt to settle such Dispute through informal negotiations. To this effect, they shall consult and negotiate with each other, in good faith for a period of thirty (30) days and, recognizing their mutual interests, attempt to reach a just and equitable solution satisfactory to both parties.

13.1.2.2 Arbitration. Any Dispute, which remains unresolved at the end of such thirty (30) day period, shall be submitted to binding arbitration in accordance with Chapter 1, Title 9 of the United States Code (Federal Arbitration Act). Arbitration shall be administered by the American Arbitration Association ("AAA") in accordance with its Commercial - Arbitration Rules as supplemented by its Supplementary Procedures for Complex Cases.

A.P. Doc. No. 28, Exhibit A.

10. The lease defines the term "parties" to mean "Landlord and Tenant." "'Parties' shall mean Landlord and Tenant." A.P. Doc. No. 28, Exhibit A. It likewise defines the term "party" to mean either the "Landlord or Tenant." Id.

11. On December 6, 2005, with GBA's consent, SREG purported to assign its interest in the lease to Sloss Goodall-Brown, LLC ("SGB"). A.P. Doc. No. 28, Exhibit B. The document in which the assignment was effected, which was executed by Mr. Latimer (on behalf of GBM for GBA), SREG and SGB, contains the representation that SGB was, at that point in time, a limited liability company wholly owned by SREG. SREG promised in the document to continue its complete ownership of SGB for the remainder of the lease term, absent GBA's permission to do otherwise. Moreover, SGB promised in that document not to assign its interest in the lease without GBA's written consent.

12. Problematic to the efficacy of the purported assignment is the fact that SGB did not exist as a legal entity. It was not legally formed until December 8, 2009, when its articles of formation were filed in the office of the probate judge of Jefferson County, Alabama. A.P. Doc. No. 28, Exhibit C. SGB's articles of formation list SREG as its sole initial member.

13. On August 30, 2006, SREG provided a letter to GBA purporting to terminate the lease effective November 1, 2006.

3

14. On July 20, 2010, GBA delivered a letter to SREG and SGB purporting to terminate the lease for nonpayment of rent.

15. On October 7, 2010, Superior Bank, which had been assigned the note, GBA, and Mr. Latimer, the lone remaining guarantor, entered into the final amendment to the note and other agreements relating thereto. The document effecting those amendments is entitled "Eighth Amendment to Loan Documents and Forbearance Agreement." A.P. Doc. No. 28, Exhibit 2A. Mr. Latimer executed that document on behalf of GBA in his representative capacity as manager of GBM, GBA's general partner, and in his personal capacity as guarantor.

16. Among other things, the amendment extended the maturity date of the note until August 5, 2013. In addition, the parties thereto recognized the default occasioned by SREG's nonpayment of rent which resulted in GBA's termination of its lease:

> As referenced in the Seventh Amendment to Loan Documents dated October 31, 2006, Borrower executed a master lease of the Project on October 1, 2005 (the "Master Lease") to Sloss Real Estate Group, Inc. ("Sloss"). Sloss has ceased paying rent and has requested an adjustment to the terms of the Master Lease. Borrower and Sloss have conducted negotiations on a modification of the Master Lease to resolve the default by Sloss, but no agreement has been reached by the parties thereto, and the Master Lease remains in default (the "Sloss Default"). The Sloss Default is an Event of Default under the Loan Agreement.

"Eighth Amendment to Loan Documents and Forbearance Agreement" A.P. Doc. No. 28, Exhibit A2.

Superior Bank, however, agreed in the amendment to forbear from exercising its rights to accelerate the note and foreclose its mortgage based on the default resulting from SREG's nonpayment of rent until September 1, 2011, provided GBA continued to make its payments when due, no other events constituting defaults occurred, and the proceeds of any settlement between SREG and GBA were turned over to it.

17. On August 31, 2010, GBA filed suit in the state circuit court against SREG and SGB seeking $452,698.12 in rents due under the lease and $11,207 in rents purportedly converted by SREG/SGB from subtenants who were supposed to have made rent payments directly to GBA following their default under the lease.

18. On January 17, 2011, Mr. Latimer filed the present bankruptcy case under Chapter 11.

19. On January 26, 2011, GBA amended its state court complaint. In the amendment, it listed as additional defendants Sloss Real Estate Group, Inc., Sloss Real Estate Company, Inc., Leigh Ferguson, Catherine S. Crenshaw, Jack Peterson, A.

4

Page Sloss, Jr., Ronald J. Cappello, and Vicki H. Bolton. It added as additional grounds for liability allegations that the defendants, in order to defraud GBA, falsely represented that SGB had been legally formed when the lease assignment took place; that SGB is a sham entity formed solely by the defendants to perpetrate a fraudulent scheme to avoid paying the rent owed under the lease; that because of their alleged complicity in that scheme, the corporate veil should be pierced and liability imposed on the individual defendants; and that all said defendants were engaged in a conspiracy to accomplish that scheme.

20. According to Second Avenue's complaint in this case, on April 18, 2011, Mr. Latimer, on behalf of GBA, sent a letter to one of its lessees, Bottled Poetry, LLC, offering to accept prepayment of a discounted amount of rent for the remainder of that entity's term. By accepting the offer, Bottled Poetry had to pay only a lump sum of $30,792.68, rather than the $36,226.68 in monthly payments that it would otherwise had to pay over the course of the remaining eight months of its lease. A.P. Doc. No. 1, Exhibit H.

21. On June 24, 2011, the state court issued an order: (1) referring GBA's claims against the corporate entities and limited liability companies to arbitration pursuant to the arbitration clause in the lease; and (2) denying, until after the completion of discovery, the individual defendants' request to stay litigation of GBA's claims against them until after completion of the arbitration proceeding. A.P. Doc. No. 28, Exhibit E.

22. On August 12, 2011, Mr. Latimer converted his case to Chapter 7.

23. On September 22, 2011, Second Avenue Holdings, LLC was legally formed. A.P. Doc. No. 28, Exhibit H. Its articles of organization list Catherine S. Crenshaw as the sole initial member.

24. On October 5, 2011, Superior Bank notified GBA that GBA was in default and that it was, consequently, exercising its rights under the mortgage to seize rents payable from GBA's tenants. According to Second Avenue's complaint, Superior simultaneously made demands on GBA's tenants, Red Rock Realty Group, Inc. and The Wine Loft of Birmingham, to forward their rent payments to it rather than GBA.

25. On October 24, 2011, Second Avenue purchased the note owed by GBA from Superior Bank for $2,400,000. A.P. Doc. No. 28, Exhibit A3.

26. On December 2, 2011, Second Avenue sent a notice to GBA informing GBA that it was foreclosing its mortgage, that the amount then due under the note secured by the mortgage was $3,002,379.54, and that the property would be sold to satisfy that debt at public outcry to the highest bidder on January 3, 2012. Second Avenue purchased the property at the foreclosure sale for a credit bid of $2,600,000.

5

27.   On December 12, 2011, Second Avenue filed the present adversary proceeding alleging that Mr. Latimer personally orchestrated GBA's receipt of the discounted, prepayment of rent from Bottled Poetry in violation of the security agreement. Second Avenue concluded that the debtor's actions caused GBA not to remit that rent to Superior Bank, and therefore the debtor owes a debt for that rent to Second Avenue which is not, by virtue of 11 U.S.C. §§ 523(a)(2A), (a)(4), and (a)(6) dischargeable in bankruptcy.  It contends furthermore that Mr. Latimer's conduct should preclude him from obtaining a discharge altogether by virtue of 11 U.S.C. §§ 727(a)(2), (a)(3).

28.   On January 26, 2012, GBA amended its state court complaint a second time to add a count alleging that the corporate and individual defendants described therein, by defaulting on the lease, and then forming Second Avenue and orchestrating that entity's purchase of the note from Superior Bank, and subsequent foreclosure, tortuously interfered with its contract with Superior Bank.

29.   On July 13, 2012, the state court referred all claims made by GBA against the individual defendants named in its complaint to arbitration. The state court based that referral on two findings. Those were: (1) that the corporate defendants were the alter egos of the individual defendants, and, therefore, are the real assignees of the lease, rather than SGB, and, consequently, are subject to the arbitration provision in the lease; and (2) that because SGB was legally nonexistent when the lease assignment took place, the individual defendants, operating as a de facto partnership became assignees of the lease and are, consequently, subject to the arbitration provision.

In addition, the state court found that the individual defendants were parties ro the master lease. It wrote:

> a. The Corporate Defendants are the mere Instrumentality or alter ego of the Individual Defendants or alternatively that because Sloss Goodall-Brown had not been incorporated as of the date of the execution of the Assignment in December of 2005 that the Individual Defendants were acting as a partnership or proprietorship from the date of the assignment and at all times at issue.

A.P. Doc. No. 46.

## II.  CONCLUSIONS OF LAW

Mr. Latimer seeks an order:

compelling arbitration of all disputes between these parties and all issues presented in this Adversary Proceeding, No. 11-00432.65 (the "AP"),

6

except the issue of whether Latimer is entitled to a discharge and whether any debt owed to the plaintiff, Second Avenue Holdings, LLC ("Second Avenue"), is due to be excepted from discharge, and staying all court proceedings related to this AP pending the completion of arbitration.

Motion to Compel Arbitration and Stay Adversary Proceeding at 1, A.P. Doc. No. 27.

## A. Compelling Arbitration

There is no agreement to arbitrate disputes between Mr. Latimer and Second Avenue with respect to either the loan, or the mortgage, or the lease. In fact, there is no express agreement to arbitrate disputes with respect to those contracts between GBA and Second Avenue.

Second Avenue is subject to the arbitration provision in the lease as a result of the automatic assignment of leases provision in the security agreement. Mr. Latimer, who is not personally a party to the lease, is not.

"[A]rbitration is a matter of contract, and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." Custom Performance, Inc. v. Dawson, 57 So.3d 90, 97 (Ala. 2010)(citations and internal quotation marks omitted). "Generally, a nonsignatory to an arbitration agreement cannot be forced to arbitrate [his] claims." Id. (citations and internal quotation marks omitted). Since there is no explicit agreement to arbitrate disputes between Mr. Latimer and Second Avenue, either with respect to the loan or the lease, the former's request to have the factual issues in this case resolved in the pending arbitration proceeding must be premised on other grounds.

Applicable state law provides the rule of decision for the question of whether a non-party to a contract containing an arbitration clause, namely Mr. Latimer in the present case, can enforce that clause against a party to the contract, namely Second Avenue. Lawson v. Life of the South Ins. Co., 648 F.3d 1166, 1171 (11th Cir. 2011).

Under Alabama law, a nonsignatory to a contract containing an arbitration provision may be compelled to arbitrate his claims against a signatory to the contract if the nonsignatory is a third-party beneficiary of the contract; or under an equitable estoppel theory if the nonsignatory is asserting legal claims to enforce rights or obtain benefits that depend on the existence of the contract that contains the arbitration agreement. Custom Performance, Inc. v. Dawson, 57 So.3d at 97-98. Also, under the doctrine of intertwining claims, "a nonsignatory to an arbitration agreement may compel a signatory to arbitrate claims 'where arbitrable and nonarbitrable claims are so closely related that the party to a controversy subject to arbitration is equitably estopped to deny the arbitrability of the related claim.'" Id. at 99 (quoting Conseco Fin. Corp. v. Sharman, 828 So.2d 890, 893 (Ala.2001)(citing Cook's Pest Control, Inc. v. Boykin, 807 So.2d 524 (Ala.2001)).

7

None of those theories may be invoked by either a nonsignatory to compel arbitration by a signatory, or a signatory to compel arbitration by a nonsignatory, if the language of the contract containing the arbitration clause explicitly limits the clauses applicability to the parties to the contract. Fountain v. Ingram, 926 So.2d 333, 338 (Ala. 2005); Jim Burke Automotive, Inc. v. McGrue, 826 So.2d 122, 131 (Ala. 2002); Ex parte Stamey, 776 So.2d 85, 89-90 (Ala. 2000). The lease specifically limits the applicability of the arbitration clause contained therein to disputes between the "landlord" and "tenant." Mr. Latimer is neither. Moreover, the cause of action asserted by Second Avenue in this case is grounded on rights and responsibilities created by and embodied in the security agreement, which contains no arbitration requirement, rather than the lease, which contains the arbitration clause relied upon by Mr. Latimer. Furthermore, the arbitration clause only requires arbitration of "disputes ... concerning this Lease." The dispute before the Court concerns the security agreement, not the lease. Consequently, since the arbitration clause is limited in scope to the parties to the lease, which he is not, and to disputes concerning the lease, which the present matter does not concern, and the arbitration clause which he seeks to enforce is not contained in the document which forms the basis of the dispute in this lawsuit, Mr. Latimer possesses no basis for compelling Second Avenue to arbitrate the issues in this case.

Therefore, the Court finds that the part of the debtor's motion seeking to compel arbitration is due to be denied.

## B. Stay of the Dischargeability Proceeding

Mr. Latimer also asks the Court to stay litigation of this dischargeability proceeding until the arbitration has concluded. "When confronted with litigants advancing both arbitrable and nonarbitrable claims... courts have discretion to stay nonarbitrable claims." Klay v. All Defendants, 389 F.3d 1191, 1204 (11th Cir. 2004). "In this instance, courts generally refuse to stay proceedings of nonarbitrable claims when it is feasible to proceed with the litigation." Id. "Crucial to this determination is whether arbitrable claims predominate or whether the outcome of the nonarbitrable claims will depend upon the arbitrator's decision." Id.

Unlike the situation in Klay, this Court does not have before it arbitrable issues and nonarbitrable issues, having sent the former to arbitration and faced with the decision of whether to stay resolution of the latter until after arbitration is finished. Like the situation in Klay, however, it is faced with a situation where the issues before it, i.e., the dischargeability vel non of the debt allegedly owed by Mr. Latimer to Second Avenue, and Second Avenue's objection to his discharge, are not arbitrable and the resolution of related, germane issues is pending in a parallel arbitration proceeding.

Klay relies as authority for its conclusions the following statement made by the Supreme Court in a footnote in Moses H. Cone Memorial Hosp. v. Mercury Const. Corp., 460 U.S. 1, 21 n.23 (1983). It reads:

8

In some cases, of course, it may be advisable to stay litigation among the non-arbitrating parties pending the outcome of the arbitration. That decision is one left to the district court (or to the state trial court under applicable state procedural rules) as a matter of its discretion to control its docket. <u>See generally</u> <u>Landis v. North American Co.</u>, 299 U.S. 248, 254-255, 57 S.Ct. 163, 165-66, 81 L.Ed. 153 (1936).

460 U.S. 1, 21 n.23.

As authority for that statement of law, the Supreme Court, as indicated, relied on its previous decision in <u>Landis v. North American Co.</u>, 299 U.S. 248 (1936), in which it enunciated, and initially set the parameters of, the federal trial court's power to stay or otherwise postpone the trial of proceedings before it. <u>Landis</u> included:

Viewing the problem as one of power, and of power only, we find ourselves unable to assent to the suggestion that before proceedings in one suit may be stayed to abide the proceedings in another, the parties to the two causes must be shown to be the same and the issues identical. Indeed, counsel for the respondents, if we understand his argument aright, is at one with us in that regard, whatever may have been his attitude at the hearing in the courts below. Apart, however, from any concession, the power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants. How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance. <u>Kansas City Southern R. Co. v. United States</u>, 282 U.S. 760, 763, 51 S.Ct. 304, 305, 306, 75 L.Ed. 684; <u>Enelow v. New York Life Ins. Co.</u>, 293 U.S. 379, 382, 55 S.Ct. 310, 311, 79 L.Ed. 440. True, the suppliant for a stay must make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to some one else. Only in rare circumstances will a litigant in one cause be compelled to stand aside while a litigant in another settles the rule of law that will define the rights of both. Considerations such as these, however, are counsels of moderation rather than limitations upon power. There are indeed opinions, though none of them in this court, that give color to a stricter rule. Impressed with the likelihood or danger of abuse, some courts have stated broadly that, irrespective of particular conditions, there is no power by a stay to compel an unwilling litigant to wait upon the outcome of a controversy to which he is a stranger. <u>Dolbeer v. Stout</u>, 139 N.Y. 486, 489, 34 N.E. 1102; <u>Rosenberg v. Slotchin</u>, 181 App.Div. 137, 138, 168 N.Y.S. 101; <u>cf</u>. <u>Wadleigh v. Veazie</u>, Fed.Cas.No.17,031; <u>Checker Cab Mfg. Co. v. Checker Taxi Co.</u>, (D.C.) 26 F.(2d) 752; <u>Jefferson Standard Life Ins. Co. v. Keeton</u>, (C.C.A.) 292 F. 53. Such a formula, as we view it, is too

Case 11-00432-DSC    Doc 48    Filed 03/26/13    Entered 03/26/13 14:30:49    Desc Main
Document    Page 9 of 34

mechanical and narrow. <u>Kansas City Southern R. Co. v. United States</u>, <u>supra</u>; <u>Friedman v. Harrington</u>, (C.C.) 56 F. 860; <u>Amos v. Chadwick</u>, L.R. 9 Ch.Div. 459; L.R. 4 Ch.Div. 869, 872. All the cases advancing it could have been adequately disposed of on the ground that discretion was abused by a stay of indefinite duration in the absence of a pressing need. If they stand for more than this, we are unwilling to accept them. Occasions may arise when it would be 'a scandal to the administration of justice' in the phrase of Jessel, M.R. (<u>Amos v. Chadwick</u>, L.R. 9 Ch.Div. 459, 462), if power to coordinate the business of the court efficiently and sensibly were lacking altogether.

299 U.S. at 254-255.

<u>Landis</u> involved three lawsuits proceeding simultaneously in separate district courts. Two were to enjoin the enforcement of a particular statute. One sought enforcement of the same statute. The plaintiffs in two of the cases were defendants in the third and the plaintiff in the third case was the defendant in the other two. Justice Cardozo couched the issue in the case as, "The controversy hinges upon the power of a court to stay proceedings in one suit until the decision of another, and upon the propriety of using such a power in a given situation." 299 U.S. at 249.

The Supreme Court reiterated the precepts enunciated in <u>Landis</u> in <u>American Life Ins. Co. v. Stewart</u>, 300 U.S. 203 (1937), albeit in dicta. In that case, after an insured's death, an action was brought in equity to cancel an insurance policy for misrepresentations allegedly made by the application. The beneficiary subsequently filed a separate suit at law to recover the proceeds of the policy. Both lawsuits were filed in federal district court. As a "for what its worth," the Court posited that the trial court, had it been asked to do so, could have considered whether justice would be done by suspending the first suit until the second had been completed:. <u>American Life</u> included:

A court has control over its own docket. <u>Landis v. North American Co.</u>, December 7, 1936, 299 U.S. 248, 57 S.Ct. 163, 81 L.Ed. 153. In the exercise of a sound discretion it may hold one lawsuit in abeyance to abide the outcome of another, especially where the parties and the issues are the same. <u>Id</u>. If request had been made by the respondents to suspend the suits in equity till the other causes were disposed of, the District Court could have considered whether justice would not be done by pursuing such a course, the remedy in equity being exceptional and the outcome of necessity. Cf. <u>Harnischfeger Sales Corp. v. National Life Ins. Co.</u> (C.C.A.) 72 F.(2d) 921, 922, 923. There would be many circumstances to be weighed, as, for instance, the condition of the court calendar, whether the insurer had been precipitate or its adversaries dilatory, as well as other factors. In the end, benefit and hardship would have to be set off, the one against the other, and a balance ascertained. <u>Landis v. North American Co.</u>, supra.

300 U.S. at 216.

In Colorado River Water Conservation Dist. v. United States, 424 U.S. 800 (1976), the Court recognized the qualified power of a federal trial court to stay proceedings before it when a parallel action involving the same or substantially the same issues and parties is pending in state court. Colorado River included:

> Although this case falls within none of the abstention categories, there are principles unrelated to considerations of proper constitutional adjudication and regard for federal-state relations which govern in situations involving the contemporaneous exercise of concurrent jurisdictions, either by federal courts or by state and federal courts. These principles rest on considerations of "(w)ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation." Kerotest Mfg. Co. v. C-O-Two Fire Equipment Co., 342 U.S. 180, 183, 72 S.Ct. 219, 221, 96 L.Ed. 200, 203 (1952). See Columbia Plaza Corp. v. Security National Bank, 173 U.S.App.D.C. 403, 525 F.2d 620 (1975). Generally, as between state and federal courts, the rule is that "the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction . . . ." McClellan v. Carland, supra, 217 U.S. at 282, 30 S.Ct. at 505, 54 L.Ed., at 767. See Donovan v. City of Dallas, 377 U.S. 408, 84 S.Ct. 1579, 12 L.Ed.2d 409 (1964). As between federal district courts, however, though no precise rule has evolved, the general principle is to avoid duplicative litigation. See Kerotest Mfg. Co. v. C-O-Two Fire Equipment Co., supra; Steelman v. All Continent Corp., 301 U.S. 278, 57 S.Ct. 705, 81 L.Ed. 1085 (1937); Landis v. North American Co., 299 U.S. 248, 254, 57 S.Ct. 163, 165, 81 L.Ed. 153, 158 (1936). This difference in general approach between state-federal concurrent jurisdiction and wholly federal concurrent jurisdiction stems from the virtually unflagging obligation of the federal courts to exercise the jurisdiction given them. England v. Louisiana State Bd. of Medical Examiners, 375 U.S. 411, 415, 84 S.Ct. 1, 464, 11 L.Ed.2d 440, 444 (1964); McClellan v. Carland, supra, 217 U.S., at 281, 30 S.Ct. at 504, 54 L.Ed. at 766; Cohens v. Virginia, 6 Wheat. 264, 404, 5 L.Ed. 257 (1821)(dictum). Given this obligation, and the absence of weightier considerations of constitutional adjudication and state-federal relations, the circumstances permitting the dismissal of a federal suit due to the presence of a concurrent state proceeding for reasons of wise judicial administration are considerably more limited than the circumstances appropriate for abstention. The former circumstances, though exceptional, do nevertheless exist.
> It has been held, for example, that the court first assuming jurisdiction over property may exercise that jurisdiction to the exclusion of other courts. Donovan v. City of Dallas, supra, 377 U.S. at 412, 84 S.Ct. at 413, 12 L.Ed.2d at 1582; Princess Lida v. Thompson, 305 U.S. 456, 466,

11

59 S.Ct. 275, 280, 83 L.Ed. 285, 291 (1939); United States v. Bank of New York & Trust Co., 296 U.S. 463, 477, 56 S.Ct. 343, 347, 80 L.Ed. 331, 338 (1936). But cf. Markham v. Allen, 326 U.S. 490, 66 S.Ct. 296, 90 L.Ed. 256 (1946); United States v. Klein, 303 U.S. 276, 58 S.Ct. 536, 82 L.Ed. 840 (1938). This has been true even where the Government was a claimant in existing state proceedings and then sought to invoke district-court jurisdiction under the jurisdictional provision antecedent to 28 U.S.C. § 1345. United States v. Bank of New York & Trust Co., supra, 296 U.S. at 479, 56 S.Ct. at 348, 80 L.Ed. at 339. But cf. Leiter Minerals, Inc. v. United States, 352 U.S. 220, 227-228, 77 S.Ct. 287, 291-292, 1 L.Ed.2d 267, 274 (1957). In assessing the appropriateness of dismissal in the event of an exercise of concurrent jurisdiction, a federal court may also consider such factors as the inconvenience of the federal forum, cf. Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947); the desirability of avoiding piecemeal litigation, cf. Brillhart v. Excess Ins. Co., 316 U.S. 491, 495, 62 S.Ct. 1173, 1175, 86 L.Ed. 1620, 1625 (1942); and the order in which jurisdiction was obtained by the concurrent forums, Pacific Live Stock Co. v. Oregon Water Bd., 241 U.S. 440, 447, 36 S.Ct. 637, 640, 60 L.Ed. 1084, 1096 (1916). No one factor is necessarily determinative; a carefully considered judgment taking into account both the obligation to exercise jurisdiction and the combination of factors counseling against that exercise is required. See Landis v. North American Co., supra, 299 U.S. at 254-255, 57 S.Ct. at 165-166, 81 L.Ed. at 158. Only the clearest of justifications will warrant dismissal.

424 U.S. at 817-819.

"[The] Colorado River analysis is applicable as a threshold matter when federal and state proceedings involve substantially the same parties and substantially the same issues." Ambrosia Coal and Const. Co. v. Pages Morales, 368 F.3d 1320, 1330 (11th Cir. 2004)(parenthetical added). And while the Colorado River opinion was couched in terms of dismissal, the Eleventh Circuit Court of Appeals has clarified that a stay of the federal action, rather than dismissal of the same, is the appropriate course in the event the Colorado River factors dictate deference to the state court suit. Its opinion in Moorer v. Demopolis Waterworks and Sewer Bd., 374 F.3d 994 (11th Cir. 2004) included:

We now join our sister circuits in holding that "a stay, not a dismissal, is the proper procedural mechanism for a district court to employ when deferring to a parallel state-court proceeding under the Colorado River doctrine." LaDuke, 879 F.2d at 1561-2; Mahaffey, et al. v. Bechtel Assoc. Prof'l Corp., D.C., et al., 699 F.2d 545, 546-47 (D.C.Cir.1983)(holding that a stay "effectively conserve[s] court resources while avoiding premature rejection of the litigant's access, as specified by statute, to a federal forum"). A stay is preferred because it lessens the concerns associated with statute of limitations, brings "the federal action back before the same

12

federal judge that had previously considered the case ... [and] [i]t protects the rights of all the parties without imposing any additional costs or burdens on the district court."  LaDuke, 879 F.2d at 1562.  The district court erred in dismissing this action.

Id. at 998.

Both Colorado River and Ambrosia Coal, in reliance on Colorado River, make it abundantly clear that the six Colorado River factors are only applicable when parallel state and federal proceedings are involved, and not to situations where both proceedings are in federal court.  Ambrosia Coal included:

> [W]hen multiple federal district courts might contemporaneously litigate concurrent jurisdictions, although "no precise rule has evolved, the general principle is to avoid duplicative litigation." [quoting Colorado River, 424 U.S. at 817].

> This general principle does not apply, however, when the duplicative litigation arises between state and federal courts.  As the Supreme Court recognized, "[g]enerally, as between state and federal courts, the rule is that the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction...." Id. (marks and citations omitted).  Federal courts have a "virtually unflagging obligation ... to exercise the jurisdiction given them."  Id.  A policy permitting federal courts to yield jurisdiction to state courts cavalierly would betray this obligation. Thus, federal courts can abstain to avoid duplicative litigation with state courts only in "exceptional" circumstances [i.e., under the circumstances outlined in Colorado River]. Id. at 818, 96 S.Ct. at 1246.

Ambrosia Coal and Const. Co. v. Pages Morales, 368 F.3d at 1328.

This is not a situation such as those addressed by the courts in Colorado River and Ambrosia Coal, where one lawsuit is pending in federal court and another is pending in state court involving the same or substantially the same parties and issues.

The principles enunciated in Colorado River, and repeated in Ambrosia Coal, to-wit: that stay considerations in parallel state and federal proceedings require consideration of the six Colorado River factors while stay considerations in parallel federal proceedings require consideration of a Landis based "avoid[ance] [of] duplicative litigation" standard, (Colorado River at 1246) was reiterated with clarification for the present circumstances in the previously mentioned Moses H. Cone Memorial Hosp. v. Mercury Const. Corp., 460 U.S. 1, 21 n.23 (1983).  That case involved a dispute between a hospital and a contractor who the hospital had hired to construct additions to the hospital.  The construction contract had an arbitration provision.  A

13

dispute arose between the parties. The hospital filed an action in state court against the contractor and the architect on the project seeking a declaratory judgment that there was no right to arbitration, that it was not liable to the contractor, and that if it was liable it would be entitled to indemnity from the architect. The contractor then filed a diversity-of-citizenship action in federal district court seeking an order compelling arbitration under § 4 of the United States Arbitration Act. The district court stayed the action pending resolution of the state-court suit because both actions involved the same parties and the same issue, i.e., arbitrability of the dispute. The Court of Appeals reversed and remanded the case with instructions to enter an order compelling arbitration. The Supreme Court concluded that the Colorado River factors provided the appropriate litmus, and upon its consideration of those factors, affirmed the Court of Appeals. The hospital argued that if the district court ordered arbitration between it and the contractor, it would have to proceed on two fronts: one in arbitration against the contractor and one in state court against the architect who was not party to the arbitration agreement. The Supreme Court rejected that argument based on its conclusion that the only common issue in the two proceedings was arbitrability and requiring the district court to address that issue would not result in piecemeal litigation of that particular issue. With respect to the resulting piecemeal litigation of the underlying issues between the parties, i.e., the hospital's liability to the contractor in arbitration and the architect's liability to the hospital via indemnity in state court, the Court's practical suggestion, at least for future reference, was for the court entertaining the nonarbitrable issues to stay resolution of those issues pending conclusion of arbitration. Cone Memorial Hospital included:

> In some cases, of course, it may be advisable to stay litigation among the non-arbitrating parties pending the outcome of the arbitration. That decision is one left to the district court (or to the state trial court under applicable state procedural rules) as a matter of its discretion to control its docket. See generally Landis v. North American Co., 299 U.S. 248, 254-255, 57 S.Ct. 163, 165-66, 81 L.Ed. 153 (1936).

460 U.S. at 21 n.23.

The Supreme Court said that the decision of the district court to stay or not stay the case before it, which involved only the issue of arbitrability, pending conclusion of a parallel state case addressing the same issue, hinged on consideration of the six Colorado River factors but, as indicated by the language of the quoted footnote, the decision to stay a proceeding involving nonarbitrable issues pending conclusion of a parallel arbitration proceeding hinges on Landis considerations.

As in Landis, American Life, Moses, with respect to the scenario described in footnote 23 of that opinion, and Klay, Landis considerations, and not Colorado River considerations, have dictated the results in other Supreme Court and Eleventh Circuit Court of Appeals decisions which have not involved parallel federal and state proceedings. In Air Line Pilots Ass'n v. Miller, 523 U.S. 866 (1998) the defendant union

14

was the exclusive bargaining agent for pilots employed by commercial air carriers, including Delta Air Lines. The union and Delta amended their collective-bargaining agreement to include an agency-shop clause which required each pilot who was not a union member to pay the union a monthly service charge for the representation of such employee. Several Delta nonunion pilots filed suit against the union in federal district court charging that the agency shop clause was unlawful. The pilots unsuccessfully moved for a preliminary injunction. The union began collecting the agency fees in the amount of 2.35 percent of each pilot's earnings. The union ultimately determined that 19 percent of its expenses for that year were not germane to collective bargaining and accordingly reduced the fees charged the nonunion pilots. Under the union's policies applicable to the agency fees, pilots who objected to the fee calculation could request arbitration. The nonunion pilots filed objections. The union referred those objections to arbitration along with those submitted by union pilots. The nonunion pilots amended their district court complaint to add a count challenging the manner in which the union calculated the agency fee and asked the arbitrator to suspend the arbitration. The arbitrator declined to defer to the federal court litigation and the district court denied a motion to enjoin the arbitration. The nonunion pilots entered a conditional appearance in the arbitration proceedings. The arbitrator ultimately sustained the union's agency-fee calculation in substantial part. After the arbitrator issued his decision, the district court granted summary judgment for the union in the federal court action, concluding that the nonunion pilots seeking to challenge a union's agency-fee calculation must exhaust arbitral remedies before proceeding in court. Accordingly, the court held that the nonunion pilots qualified for clear-error review of the arbitrator's fact-findings and de novo review of all legal issues. Then, having determined that the arbitrator had committed no error of law or fact, the court sustained his decision. The Court of Appeals found no legal basis for requiring objectors to arbitrate agency-fee challenges unless they had agreed to do so and reversed, holding that the arbitrator's decision had no application to the nonunion pilots' objections. The Supreme Court framed the question before it as, "whether an objector must exhaust a union-provided arbitration process before bringing an agency-fee challenge in federal court..." if that objector was not signatory to the arbitration requirement. 523 U.S. at 871. It answered that question in the negative. In doing so it noted the union's concern that it would be consequently required to litigate the agency-fee challenges in two forums simultaneously: (1) against nonsignatory objectors in district court; and (2) against signatory objectors in arbitration. The Court countered that that result could be ameliorated by the district court's exercise of its discretion under Landis to stay the action before it until after conclusion of the arbitration proceeding. Air Line Pilots Ass'n included:

> Our recognition of the right of objectors to proceed directly to court does not detract from district courts' discretion to defer discovery or other proceedings pending the prompt conclusion of arbitration. See, e.g., Landis v. North American Co., 299 U.S. 248, 254-255, 57 S.Ct. 163, 166, 81 L.Ed. 153 ( 1936) ("[ T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for

Case 11-00432-DSC    Doc 48    Filed 03/26/13    Entered 03/26/13 14:30:49    Desc Main
Document      Page 15 of 34

litigants. How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance.").

Id. at 879 n.6.

In Clinton v. Jones, 520 U.S. 681 (1997), an individual sued the sitting President of the United States in federal district court. The district court denied the President's motion to dismiss, but granted him temporary immunity until he left office. The Supreme Court held that the Constitution does not generally afford the President temporary immunity from suit for civil damages arising out of events that occurred before he took office; the doctrine of separation of powers does not require federal courts to stay all private actions against the President until he leaves office; and the district court abused its discretion in deferring the trial of the lawsuit until after the President left office. In doing so, it recognized a trial court's, "broad discretion to stay proceedings as an incident to its power to control its own docket," citing Landis, but concluded that the stay granted in that case was impermissible because it was too, "lengthy and categorical ... [and took] no account whatever of the ... [plaintiff's] interest in bringing the case to trial," and "delaying trial would increase the danger of prejudice resulting from the loss of evidence, including the inability of witnesses to recall specific facts, or the possible death of a party." 520 U.S. at 707-708 (parentheticals added). The Court explained:

> Strictly speaking the stay was not the functional equivalent of the constitutional immunity that petitioner claimed, because the District Court ordered discovery to proceed. Moreover, a stay of either the trial or discovery might be justified by considerations that do not require the recognition of any constitutional immunity. The District Court has broad discretion to stay proceedings as an incident to its power to control its own docket. See, e.g., Landis v. North American Co., 299 U.S. 248, 254, 57 S.Ct. 163, 165– 166, 81 L.Ed. 153 ( 1936). As we have explained, "[e]specially in cases of extraordinary public moment, [ a plaintiff] may be required to submit to delay not immoderate in extent and not oppressive in its consequences if the public welfare or convenience will thereby be promoted." Id., at 256, 57 S.Ct., at 166. Although we have rejected the argument that the potential burdens on the President violate separation–of–powers principles, those burdens are appropriate matters for the District Court to evaluate in its management of the case. The high respect that is owed to the office of the Chief Executive, though not justifying a rule of categorical immunity, is a matter that should inform the conduct of the entire proceeding, including the timing and scope of discovery.

> ...

Nevertheless, we are persuaded that it was an abuse of discretion for the District Court to defer the trial until after the President leaves office. Such a lengthy and categorical stay takes no account whatever of the respondent's interest in bringing the case to trial. The complaint was filed within the statutory limitations period — albeit near the end of that period — and delaying trial would increase the danger of prejudice resulting from the loss of evidence, including the inability of witnesses to recall specific facts, or the possible death of a party.

The decision to postpone the trial was, furthermore, premature. The proponent of a stay bears the burden of establishing its need. Id., at 255, 57 S.Ct., at 166. In this case, at the stage at which the District Court made its ruling, there was no way to assess whether a stay of trial after the completion of discovery would be warranted. Other than the fact that a trial may consume some of the President's time and attention, there is nothing in the record to enable a judge to assess the potential harm that may ensue from scheduling the trial promptly after discovery is concluded. We think the District Court may have given undue weight to the concern that a trial might generate unrelated civil actions that could conceivably hamper the President in conducting the duties of his office. If and when that should occur, the court's discretion would permit it to manage those actions in such fashion (including deferral of trial) that interference with the President's duties would not occur. But no such impingement upon the President's conduct of his office was shown here.

Id. at 706-708.

In Ortega Trujillo v. Conover & Co. Communications, Inc., 221 F.3d 1262 (11th Cir. 2000), a bank brought suit in a Bahamian court against several members of the Ortega family and associated companies alleging that they misappropriated funds from the bank through the use of fraudulent loan transfers. In connection with that case, the bank's public relations firm issued a press release accusing the Ortegas of perpetrating a massive fraud scheme. The Ortegas then brought suit in a United States federal district court against the bank and its public relations firm for defamation.

The district court sua sponte stayed the case before it pending resolution of the Bahamian lawsuit and "until such time as the Bahamian Courts conclude their review," because the two cases were closely related, the Bahamian Litigation was filed over a year before the district court suit, a trial date had already been set in the Bahamian litigation (a finding that proved to be mistaken), and the issues in the Bahamian case directly related to those raised in the district court case. The court directed the parties to submit status reports on the progress of the Bahamian litigation every three months.

17

On appeal, the Eleventh Circuit panel vacated the stay because it found it to be "immoderate." 221 F.3d at 1264. In doing so, it recognized the power of the district court to stay proceedings before it under appropriate circumstances. <u>Ortega</u> included:

> A variety of circumstances may justify a district court stay pending the resolution of a related case in another court. A stay sometimes is authorized simply as a means of controlling the district court's docket and of managing cases before the district court. <u>See, e.g.</u>, <u>Clinton v. Jones</u>, 520 U.S. 681, 117 S.Ct. 1636, 1650, 137 L.Ed.2d 945 (1997) (discussing district court's "broad discretion to stay proceedings as an incident to its power to control its own docket"). And, in some cases, a stay might be authorized also by principles of abstention. <u>See, e.g.</u>, <u>Quackenbush v. Allstate Ins. Co.</u>, 517 U.S. 706, 116 S.Ct. 1712, 1722, 135 L.Ed.2d 1 (1996)(noting that abstention principles may require district court to stay case pending resolution of related proceedings).

<u>Id</u>.

The court, however, recognized general limitations on that power:

> When a district court exercises its discretion to stay a case pending the resolution of related proceedings in another forum, the district court must limit properly the scope of the stay. A stay must not be "immoderate." <u>CTI-Container Leasing Corp. v. Uiterwyk Corp.</u>, 685 F.2d 1284, 1288 (11th Cir.1982). In considering whether a stay is "immoderate," we examine both the scope of the stay (including its potential duration) and the reasons cited by the district court for the stay. <u>See</u> <u>Hines v. D'Artois</u>, 531 F.2d 726, 733 (5th Cir.1976). As the Supreme Court has explained, "[ a] stay is immoderate and hence unlawful unless so framed in its inception that its force will be spent within reasonable limits, so far at least as they are susceptible of prevision and description." <u>Landis v. North American Co.</u>, 299 U.S. 248, 57 S.Ct. 163, 167, 81 L.Ed. 153 ( 1936).

<u>Id</u>.

The court concluded that the stay order entered by the district court was "immoderate" because it was "indefinite in scope," since it was couched in language that would permit the stay to last until the exhaustion of all appeals in the foreign court, and that the district court's assessment that the Bahamian case was proceeding expeditiously was mistaken. The court explained:

> The scope of the stay ordered by the district court seems indefinite. The stay, by its own terms, remains in effect until the "Bahamian Courts conclude their review." The stay appears to expire only after a trial of the

18

Bahamian case and the exhaustion of appeals in that case. In addition, contrary to the district court's assessment of the Bahamian litigation, the record indicates that the Bahamian case is not progressing quickly. We conclude, therefore, that the stay is indefinite in scope. Cf. American Manuf. Mut. Ins. Co. v. Edward D. Stone, Jr. & Assoc., 743 F.2d 1519, 1524 (11th Cir.1984)(finding stay of federal court proceedings pending conclusion of state court proceedings indefinite where state proceedings had been pending for 18 months and no trial date had been set in state court); CTI-Container, 685 F.2d at 1288 (vacating district court stay where duration of stay could "safely be described as an indefinite period").

Id. at 1264-1265.

The court concluded that the tri-monthly status report requirement imposed by the trial court as a condition of the stay did not make it any less "indefinite" because it was not coupled with a requirement that the trial court actually assess the progress of the Bahamian litigation in conjunction with the submission of those status reports. The court explained further:

Plaintiffs argue that the stay is not indefinite because the district court ordered the parties to submit status reports on the Bahamian litigation every three months. This requirement, however, does not make the scope of the stay less indefinite. The district court's requirement of status reports does not guarantee that the district court will reassess the propriety of the stay every three months. The district court could do nothing when status reports are filed, and the stay would continue in effect until the Bahamian litigation concluded. As the Supreme Court explained in Landis, "an order which is to continue by its terms for an immoderate stretch of time is not to be upheld as moderate because conceivably the court that made it may be persuaded at a later time to undo what it has done." 57 S.Ct. at 167.

Id. at 1264 n.3.

The court also cited as problematic the fact that the district court failed to explain in detail its legal basis for imposing the stay, thus leaving it to speculate with respect to what that basis might be. "The stay order does not explain in detail the district court's reasoning in staying further proceedings in this case." Id. at 1265. The court attempted to deduce the legal basis relied on by the district court based on the practical considerations cited by it for imposing the stay. But it concluded that the possible legal grounds for the district court's decision that might be supported by those considerations would be insufficient. The opinion incuded:

We can see from the district court's order no reason sufficient to justify the indefinite stay that the district court ordered. The stay order

19

does not explain in detail the district court's reasoning in staying further proceedings in this case. The order does mention three considerations that the district court found important: (1) that the Bahamian case and this case involve related issues; (2) that the Bahamian case predates this case by more than one year; and (3) "that a trial date in the Bahamian Litigation has already been set." From the district court's mention of these three factors, the parties suggest two possible reasons for the district court's stay: (1) that the district court, pursuant to its inherent power to control its own docket, stayed this case for the sake of judicial economy; and (2) that the district court stayed this case under the doctrine of international abstention. We cannot justify the stay that the district court ordered on either ground. The case law illustrates that, in a case like this one, the interests of judicial economy alone are insufficient to justify such an indefinite stay. See Landis, 57 S.Ct. at 167 (vacating similar stay in like circumstances). And, we will not attempt to justify the district court's stay on abstention grounds. The district court never mentions "abstention" in its order. The district court's order cites no cases related to international abstention. And, the district court's order mentions only a few of the many factors that a district court must examine in considering an international abstention question. See Turner Entertainment Co. v. Degeto Film, 25 F.3d 1512, 1519-22 (11th Cir.1994) (discussing factors relevant to international abstention). Abstention is the exception instead of the rule, see id. at 1518; and "courts regularly permit parallel proceedings in an American court and a foreign court." Id. at 1521. Abstention, therefore, is not to be undertaken lightly. So, we-when the district court did not mention abstention at all-decline to presume that abstention motivated the district court's exercise of its discretion to stay this case. We, therefore, do not decide today whether international abstention might justify the stay that the district court ordered.

Id.

In CTI-Container Leasing Corp. v. Uiterwyk Corp., 685 F.2d 1284 (11th Cir. 1982), CTI filed suit against Uiterwyk Corporation alleging breach of leases for ocean cargo containers and related equipment. Uiterwyk moved to implead Iran and Iran Express Lines, an Iranian corporation and instrument of the Iranian government, as third-party defendants. The United States Department of Justice filed a statement of interest which expressed the United States position that the lawsuit should be stayed by virtue of an Executive Order expressing agreement between the United States and Iran which suspended all actions against Iran except to the extent they would be submitted to the Iran-United States Claims Tribunal. The district court stayed the action in toto pending determination by the Iran-United States Claims Tribunal of its jurisdiction to hear the claims against Iran and IEL.

20

On appeal, the Eleventh Circuit panel affirmed the district court's order to the extent it stayed Uiterwyk's action against Iran and IEL because that stay was mandated by the executive order. But it reversed the order to the extent it operated to stay the action between CTI and Uiterwyk because, it concluded, that stay was "indefinite or immoderate ..." 685 F.2d at 1288.

In doing so, the court recognized the power of the district court to stay actions before it. "The inherent discretionary authority of the district court to stay litigation pending the outcome of related proceeding in another forum is not questioned." Id. But it reiterated, citing Landis, that such stays will be upheld only when they are not "indefinite or immoderate." The court stated further:

> The district court has a general discretionary power to stay proceedings before it in the control of its docket and in the interests of justice. Nevertheless, stay orders will be reversed when they are found to be immoderate of an indefinite duration. In Landis v. North American Co., 299 U.S. 248 ( 57 S.Ct. 163, 81 L.Ed. 153)(1936), the Supreme Court held that a "stay is immoderate and hence unlawful unless so framed in its inception that its force will be spent within reasonable limits, so far at least as they are susceptible of prevision and description."

Id. (quoting McKnight v. Blanchard, 667 F.2d 477, 479 (5th Cir. 1982)).

The court found the stay to be immoderate or indefinite because it was impossible to estimate how long CTI would have to wait until Uiterwyk's action against Iran and IEL would be addressed by the Tribunal. It is apparent that the court was informed in that regard from its knowledge of numerous other similar proceedings involving third-party actions instituted by Uiterwyk's against Iran and IEL. It explained:

> It is difficult to accurately predict the time that CTI will be forced to stand aside if it is required to await the Tribunal's determination of its jurisdiction to hear these claims, but it can safely be described as an indefinite period of time. We cannot uphold such an indefinite or immoderate stay despite Uiterwyk's arguments to the contrary. We, therefore, agree with the procedural posture taken by other courts in similar litigation arising out of Uiterwyk's involvement with Iran and IEL. These courts that were faced with third party complaints have severed and stayed the third-party actions against Iran and IEL while allowing the principal actions against Uiterwyk to proceed to trial.

Id. at 1288-1289 (citations omitted).

Uiterwyk argued that the entire action should be stayed because: (1) it would be prejudiced in developing its evidence without the presence of Iran and IEL who were necessary for a complete resolution at one time of the rights of all parties to the

21

litigation arising out of the same facts; (2) it would be subjected to the significant expense of participating in proceedings before both the district court and the Tribunal; and (3) IEL and Iran were indispensable parties to the litigation.

The court rejected Uiterwyk's first argument because the issue in the principal action was the contract between Uiterwyk and CTI and not the alleged agency agreement between Uiterwyk and IEL. In fact, Uiterwyk's claims against Iran and IEL were contingent upon a finding in the district court that Uiterwyk was liable to CTI and the district court would have to enter a judgment in favor of CTI before the Tribunal could enter a judgment in Uiterwyk's favor against the third-party defendants. Moreover, the absence of Iran and IEL would not hamper Uiterwyk's presentation of its impossibility of performance and force majeure defenses.

The court rejected Uiterwyk's second argument because it concluded that it would not incur duplicative costs by having to litigate the principal action in district court and the action against Iran and IEL in the Tribunal because the third-party claims before the Tribunal would be stayed pending conclusion of the primary district court action. Furthermore, any extra costs Uiterwyk might incur would not outweigh the hardship to CTI if it were to be compelled to await the Tribunal's decision for an indeterminate period of time.

The court rejected Uiterwyk's third argument because even if Iran and IEL were indispensable parties they could still be joined even though Uiterwyk's action against them in the Tribunal would be stayed pending resolution of the district court suit involving CTI's claims against it. Again in that regard, the court was substantially aided and informed by its knowledge of several virtually identical situations involving third-party actions filed by Uiterwyk against Iran and IEL which had been stayed pursuant to the executive order while the principal actions in those situations had been permitted to go forward. The court explained:

> We feel that the district court's objectives of adhering to the Iran-United States Agreement, Executive Order 12,294, and the Statements of Interests filed by the United States can best be accomplished by following the paths taken by the courts in the NIC Leasing, Cotco Leasing, and Xtra cases. In these cases, Uiterwyk's motions for a stay of the entire actions were denied and the third party defendants were joined, but such third-party actions were severed under Rule 42(b), and stayed pursuant to Executive Order No. 12,294. The parties were directed to proceed with their respective principal actions. Therefore, we conclude that district court abused its discretion when it ordered a stay of this entire action.

Id. at 1290.

Case 11-00432-DSC    Doc 48    Filed 03/26/13    Entered 03/26/13 14:30:49    Desc Main
Document    Page 22 of 34

Several definitive points can be gleaned from the cases discussed above. The first point is that the Colorado River factors are only applicable if there are parallel cases proceeding simultaneously in state court and federal district court. They have no application to parallel cases proceeding in the same federal district court, or to parallel cases proceeding in two or more federal district courts, or to parallel cases proceeding simultaneously in federal district court and a foreign tribunal. Similarly, they do not apply to parallel cases proceeding simultaneously in federal district court and a specialized international tribunal, such as the Iran-United States Claims Tribunal in CTI, or to parallel cases proceeding simultaneously in federal district court and arbitration. Those situations are, instead, governed by the principles enunciated in Landis and its progeny.

The second point is that regardless of how nonarbitrable issues get to arbitration, a federal trial court has the power under Landis and its progeny, including Moses, Air Line Pilots Ass'n, and Klay, to stay litigation of nonarbitrable issues pending resolution of the arbitration of arbitrable issues.

The third point is that any stay of the litigation of nonarbitrable issues ordered by a federal trial court pursuant to Landis and its progeny may not be immoderate or indefinite.

Having identified Landis as the legal basis for staying the litigation of nonarbitrable issues in this case pending resolution of arbitrable issues being litigated in the parallel arbitration proceeding, it is essential to identify and state, to the extent possible, those considerations germane to a Landis analysis. The following axioms were considered relevant in the decisions examined above:

A court has control over its own docket.

Incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants, a court may hold one lawsuit in abeyance to abide the outcome of another.

The decision to stay one suit pending the conclusion of another requires the exercise of judgment, which must weigh competing interests and maintain an even balance.

There are many circumstances to be weighed including the condition of the court calendar, whether the parties have been precipitate or dilatory, and whether a stay is necessary to avoid duplicitous litigation. The plaintiff's (in the case to be stayed) interest in bringing the case to trial must be taken into account, as well as to what extent delaying trial may increase the danger of prejudice resulting from the loss of evidence, including the inability of witnesses to recall specific facts, or the possible death of a party.

23

A stay sometimes is authorized simply as a means of controlling the district court's docket and of managing cases before the district court. And, in some cases, a stay might be authorized also by principles of abstention.

The court may consider the burden that the supplicant for the stay may suffer if the stay is not granted by being required to simultaneously litigate two proceedings at the same time, and whether he will be prejudiced in presenting his defense in the action he wants to have stayed if it is not stayed, and to what extent resolution of the issues in the case he wants stayed will be controlled by, or substantially clarified by decisions made in the parallel case.

The interests of judicial economy alone are insufficient to justify an indefinite stay.

In the end, benefit and hardship will have to be set off, the one against the other, and a balance ascertained.

The burden of making out the justice and wisdom of a stay is on the suppliant for relief.

The stay must be kept within the bounds of moderation. It may not be of indefinite duration in the absence of a pressing need.

A stay is immoderate and hence unlawful unless so framed in its inception that its force will be spent within reasonable limits, so far at least as they are susceptible of prevision and description.

An order which is to continue by its terms for an immoderate stretch of time is not to be upheld as moderate because conceivably the court that made it may be persuaded at a later time to undo what it has done.

The stay order, therefore, may not be couched in language that will permit the stay to last indefinitely.

The court must estimate when the parallel action will be concluded, within reason, or otherwise gauge the progress and anticipated progress of that proceeding, and accordingly limit the duration of the stay to a fairly definite, reasonable period of time or an event which is anticipated to occur within a reasonable period of time.

After ordering the stay, the court should conduct regular periodic evaluations to insure that the parallel suit is proceeding expeditiously and that continuation of the stay continues to be provident, and that the

24

plaintiff in the nonstayed proceeding is not being prejudiced beyond merely the delay inherent in staying the case. Any such evaluation must be coupled with a requirement that the court actually reassess the propriety of the stay based on the progress of the parallel litigation, and its commitment to terminate or modify the stay if the parallel suit is not progressing as anticipated or is causing additional or unforeseen prejudice to the other party, or if continuation of the stay is otherwise inappropriate.

If the stay is to be based on abstention factors, the court must say so in its order, and discuss those factors, and cite abstention case law in support of its conclusions.

Before proceedings in one suit may be stayed to abide the proceedings in another, the parties to the two causes need not be the same or the issues identical.

A stay may be imposed even if the parallel action will not settle every question of fact and law in the stayed suit if the litigation in the parallel suit will in all likelihood settle or simplify many of those issues.

The court should explain in detail its reasons for granting the stay and the basis of its scope and duration.

Neither Landis nor the cases cited herein which relied on it purported to definitively outline its boundaries or define exclusively or comprehensibly what factors are germane to deciding whether and under what circumstances a stay is appropriately granted in the first instance, questions of moderation and definitiveness in scope and duration aside. Other factors not addressed or present in those cases may be germane, not the least of which is the type of proceeding involved and characteristics peculiar to that proceeding.

## C. The Present Case

In the present case, the stay question arose in the context of a bankruptcy nondischargeability adversary proceeding. As a result, one peculiar aspect of this proceeding is that the supplicant for the stay is a Chapter 7 debtor. Considerations of the economic burden which the debtor will have to bear in order to litigate in two forums at the same time are, therefore, particularly acute. In a case in which a creditor requested relief from the stay to liquidate a claim which it contended was nondischargeable in state court, this court made the observation that the potential economic burden on the debtor of having to participate in a jury trial in state court was a consideration in determining whether that course of action was advisable. This Court wrote:

Case 11-00432-DSC    Doc 48    Filed 03/26/13    Entered 03/26/13 14:30:49    Desc Main
Document    Page 25 of 34

In such a review, this Court must consider that if relief from the stay is granted, a debtor may be forced to expend substantial post-bankruptcy earnings in counsel fees and associated expenses in order to defend a state court action, or may be unable to afford to defend in state court with the result that an adverse judgment is entered against him or her, or may be forced to make a disadvantageous settlement because of a financial inability to mount a satisfactory defense in state court. If these results occur, the reservation of exclusive jurisdiction, and one of the primary reasons for it, would be undermined.

The financial burden of defending a state court proceeding (and the deleterious consequences, win or lose, which shouldering that burden will presumably have on a debtor's opportunity to gain the fresh start contemplated by the Bankruptcy Code) may preclude relief from the stay in situations were the dischargeability of the debt underlying the state court proceeding has been put into issue in the bankruptcy court (absent extenuating circumstances militating in favor of passing the litigation to the state court). Certainly, a debtor must, if relief from the stay is denied, still defend against a non-dischargeability complaint in bankruptcy, and that debtor will of course incur some expense in making that defense. However, the expense of defending in this Court will ordinarily be less than the expenditures that would be required of a debtor to mount a satisfactory defense in a state court trial. Bankruptcy procedure for determining the dischargeability of debts is, more than a trial in state court, by design, a more expedient, efficient and less costly mechanism for both determining dischargeability of a debt and for liquidating a debt underlying a claim of non-dischargeability.

In re Cummings, 221 B.R. 814, 819 (Bankr. N.D. Ala. 1998).

Granted, the situation in Cummings is not exactly parallel to the present circumstances. However, considerations with respect to the economic impact on the debtor in this case if required to simultaneously participate in two parallel proceedings are very similar. Whereas, if the present dischargeability proceeding is held in abeyance until after that portion of the arbitration proceeding involving his claims against the intertwined defendants has been completed, the debtor will only have to finance the cost of one lawsuit at a time, and if GBA is successful, the debtor's situation in this adversary could be much less complex, and far more advantageous, since the plaintiff herein, as will be discussed next, could be precluded by an adverse judgment on those claims, from pursuing a case against him. Or he will at least at that point in time be assured of sufficient funds to defend the subsequently resumed adversary proceeding and have basis for recouping any damages that may be awarded herein.

26

Moreover, a proceeding challenging the dischargeability of a debt is actually two lawsuits in one.  Section 523(a) of the Bankruptcy Code precludes "A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title... from any debt ..." of the nature described in the subsections of that statute.  The term "debt" is defined in 11 U.S.C. § 101(12) as "liability on a claim."  A "claim" is defined as "a right to payment." 11 U.S.C. § 101(5)(A).  Whether the creditor is owed a "claim," and the nature of that "claim," and the amount of that "claim," and whether the debtor is liable for that "claim," are matters that are strictly defined by state law. The U.S. Supreme Court explained in Travelers Cas. and Sur. Co. of America v. Pacific Gas and Elec. Co., 549 U.S. 443 (2007):

> Indeed, we have long recognized that the " 'basic federal rule' in bankruptcy is that state law governs the substance of claims, Congress having 'generally left the determination of property rights in the assets of a bankrupt's estate to state law.' " Ibid. (quoting Butner v. United States, 440 U.S. 48, 57, 54, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); citation omitted). Accordingly, when the Bankruptcy Code uses the word "claim"—which the Code itself defines as a "right to payment," 11 U.S.C. § 101(5)(A)—it is usually referring to a right to payment recognized under state law.  As we stated in Butner, "[p]roperty interests are created and defined by state law," and "[u]nless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." 440 U.S., at 55, 99 S.Ct. 914; accord, Vanston Bondholders Protective Comm. v. Green, 329 U.S. 156, 161, 67 S.Ct. 237, 91 L.Ed. 162 ( 1946) ("What claims of creditors are valid and subsisting obligations against the bankrupt at the time a petition in bankruptcy is filed is a question which, in the absence of overruling federal law, is to be determined by reference to state law").

Id. at 450-51.

Because the debtor must owe a debt to a creditor before that debt can be declared nondischargeable, a creditor must establish the existence and amount of the debt which he contends is nondischargeable under state law. The court in Stanbrough v. Valle (In re Valle), 469 B.R. 35 (Bankr. D. Idaho 2012) explained:

> Making a determination regarding the dischargeability of a debt involves a two-step process: first, the establishment of the debt itself; and second, a determination as to the nature—dischargeable or nondischargeable—of that debt.  Banks v. Gill Distrib. Ctrs., Inc. (In re Banks), 263 F.3d 862, 868 (9th Cir.2001).  At times the debt at issue has previously been liquidated; other times it has not. In the case of an unliquidated debt, the bankruptcy court must necessarily determine liability and damages in order to establish the underlying debt.

27

Id. at 43.

See also, Sterling Factors, Inc. v. Whelan, 245 B.R. 698, 708 (N.D. Ga. 2000) ("[A]n adversary proceeding respecting dischargeability consists of three elements: liability, damages, and dischargeability."); Trustees of the Operating Engineers Local # 965 Health Benefit Plan v. Westfall (In re Westfall), 379 B.R. 798, 802-803 (Bankr. C.D. Ill. 2007)("This Court must determine the existence of an underlying debt before reaching the dischargeability issues."); Drummond v. Freeland (In re Freeland), 360 B.R. 108, 129 (Bankr. D. Md. 2006)("When a complaint to determine nondischargeability of debt is brought in the bankruptcy court prior to the entry of a judgment in a nonbankruptcy forum, the bankruptcy court has subject matter jurisdiction, not only to determine nondischargeability of the debt, but also to liquidate the amount of the debt and enter a nondischargeable judgment therefor."); Gattalaro v. Pulver (In re Pulver), 327 B.R. 125, 132 (Bankr. W.D.N.Y. 2005)("In an Adversary Proceeding respecting dischargeability, there are three elements to be determined. These elements are liability, damages and dischargeability.").

Problematic to the liability determination in this case are the unresolved issues raised by Mr. Latimer, including his tortuous interference with business or contractual relationship cause of action, which are pending before the arbitrator. If, as he contends, that is: (1) Second Avenue is merely a fraudulent tool, formed and used by its creators to continue and accomplish a fraudulent plan to avoid responsibility under the lease; (2) to end run the purchase option in the same; (3) thereby acquire the property at a substantial discount; (4) to tortuously interfere with GBA's relationship with the lender; and (5) GBA successfully obtains a judgment against the entities named in its complaint, including the individuals who formed Second Avenue and caused it to purchase the loan – the impact on the issues in this adversary proceeding would be significant. The same would hold true if the progenitors of Second Avenue are found simply to be liable for the mountain of unpaid rent which the debtor and GBA claims to be due as a result of the former's alleged breach of the lease. The potential recovery represented by either of those causes of action would dwarf the $30,792.68 in rent which Second Avenue claims Mr. Latimer caused GBA to use in an unauthorized manner, thus providing GBA an ample right of recoupment or set-off which would eliminate the obligation that Second Avenue claims to be nondischargeable.

In addition, if GBA's claims are borne out in arbitration, depending how the facts evolve and are established in that proceeding, Mr. Latimer may be able to assert defenses based on the misconduct of Second Avenue's progenitors, or their breach of the lease, which may preclude his liability in this case altogether. If this adversary proceeding is not stayed pending the conclusion of the arbitration, the debtor will, in order to take advantage of any defenses based on the evidence which support GBA's arbitrable causes of action, have to submit that evidence in this case also. That course of action simply does not make any sense from the point of view of either judicial economy or judicial efficiency, or from the point of view of the added strain, in time, money, and resources on all involved.

28

The Court will not venture a guess as to what the outcome of the arbitration will be, or what defenses Mr. Latimer may add as a result of the findings and conclusions of the arbitrator, if any. However, it would constitute a gross injustice if Mr. Latimer is required to bear the compound expense and effort of proving his case in two proceedings instead of one, especially when the Court is unaware of any hardship that Second Avenue will suffer as a result of being required to await the outcome of the arbitration proceeding to try its case.

Staying a determination of the issues in this case until after the arbitration is through, and then applying the relevant findings from that proceeding to the present action, is closely analogous to the common practice of permitting the litigation of the issues of liability and damages in a dischargeability case to proceed in state court, where they would otherwise be tried absent bankruptcy, and holding the issues of dischargeability in abeyance until after the state court action has been concluded, where they can then be decided based on the findings of the state court. That result is often accomplished by granting relief from the stay. "Numerous courts have determined that, under appropriate circumstances, a bankruptcy court may grant relief from the stay to allow a debt to be liquidated in a pending state court proceeding, and then make a determination of dischargeability based on the state court record." In re Cummings, 221 B.R. 814, 819 n.9 (Bankr. N.D. Ala. 1998). Other courts elect to dismiss the dischargeability proceeding without prejudice to the plaintiff's right to refile it after conclusion of the state court litigation, assuming the latter results in a judgment against the debtor. Gray v. Berry (In re Gray), 2000 WL 34239244, *3 (W.D. Wis., April 12, 2000); Kowalewycz v. Sears (In re Sears), 68 B.R. 34, 36 (Bankr. W.D. Mo. 1986). Other courts elect to abstain from hearing the liability and damages issues, reserving determination of the dischargeability issues until after conclusion of the state court proceeding, pursuant to the bankruptcy abstention statute, 28 U.S.C. § 1334(c)(1), which provides: "[N]othing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding rising under title 11 or arising in or related to a case under title 11." See Wallace v. Guretzky, 2009 WL 3171767, *3 (E.D.N.Y., Sept. 29, 2009); Bricker v. Martin, 348 B.R. 28, 38-39 (W.D. Pa. 2006); Williams v. Horowitz (In re Horowitz), 2010 WL 814103, *5 (Bankr. E.D.N.Y., March 1, 2010); DiFronzo v. Wider (In re Wider), 2009 WL 4345411, *3 (Bankr. E.D.N.Y., Nov. 30, 2009); Speck v. Demers (In re Demers), 2009 WL 3681675, *1 (Bankr. E.D. Wash., Oct. 30, 2009); In re Gibson, 349 B.R. 54, 58 (Bankr. D. Idaho 2006); The Fowler & Huntting Company v. Granoff (In re Granoff), 242 B.R. 216, 221 (Bankr. D. Conn. 1999); Easley v. Dulek (In re Warren), 204 B.R. 66, 68 (Bankr. N.D. Okl. 1996); Braun v. Zarling (In re Zarling), 85 B.R. 802, 804 (Bankr. E.D. Wis. 1988); Roberts v. Goidel (In re Richards), 59 B.R. 541, 544 (Bankr. N.D.N.Y. 1986).

Case 11-00432-DSC    Doc 48    Filed 03/26/13    Entered 03/26/13 14:30:49    Desc Main
Document    Page 29 of 34

### D. Second Avenue's Complaint Does Not
### Support Its Claim of Prejudice If
### the Dischargeability Proceeding is Stayed

For purposes of deciding the present motion only, Second Avenue's complaint is insufficient with respect the allegation of its theories of nondischargeability. In Count Two, it contends that the debt allegedly owed by Mr. Latimer resulted from fraud, and is, therefore, nondischargeable by virtue of 11 U.S.C. § 523(a)(2)(A). However, it does not allege that Mr. Latimer made any misrepresentation to it, which is, of course, the sine qua non of a 523(a)(2)(A) discharge exception. In its Count Three, it contends that the debt allegedly owed by Mr. Latimer is nondischargeable because it resulted from, "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). However, the contractual relationship it describes, and which is evinced by the documents attached to the complaint, does not, on its face, constitute a technical or express, trust, which is required for fiduciary defalcation nondischargeability. Guerra v. Fernandez-Rocha (In re Fernandez-Rocha), 451 F.3d 813, 816 (11th Cir. 2006). In contrast, it describes merely a security agreement, under which, at least absent default and notice, GBA was under no duty to segregate or remit rents to Second Avenue, or its assignor, and was free to use those funds in the operation of its business, see Davis v. Aetna Acceptance Co., 293 U.S. 328, 334 (1934); Evabank v. Richardson (In re Richardson), 2007 WL 2381990 (Bankr. N.D. Ala., Aug. 17, 2007). That would seem to eliminate the possibility of larceny and embezzlement as well.

In addition, in its Count Four, Second Avenue contends that the debt allegedly owed by Mr. Latimer is nondischargeable because it resulted from his, "willful and malicious injury..." to the rents which he purportedly caused GBA to use in an unauthorized manner. 11 U.S.C. § 523(a)(6). Again, for purposes of deciding the present motion only, it appears from the complaint that the security agreement did not require GBA to segregate or remit rent to Second Avenue or its assignee until after default and notice, which did not occur until October 2011. It is, therefore, not apparent how either GBA or Mr. Latimer could have willfully and maliciously converted rents in April 2011, which is when the complaint alleges it happened, since, at that point in time, GBA was ostensibly free to use those funds in the operation of its business without obtaining any sort of additional permission from Second Avenue or its assignee. Granted, GBA's acceptance of discounted, prepaid rent was a violation of the security agreement. However, a breach of contract does not, without more, make the resulting debt nondischargeable.

Moreover, in passing, and for purposes of deciding this motion only, the Court notes that Second Avenue's right to raise nondischargeability issues is not readily apparent. Under Alabama law, which dictates whether or not Mr. Latimer owes a debt to Second Avenue, i.e., is liable to the latter, "a chose in action for recovery of converted property is not assignable." Rice v. Birmingham Coal & Coke Co., Inc., 608 So.2d 713, 715 (Ala. 1992). In fact, "It seems to be well settled, as a general

Case 11-00432-DSC    Doc 48    Filed 03/26/13    Entered 03/26/13 14:30:49    Desc Main
Document      Page 30 of 34

proposition under the common law, that a right of action arising from tort is nonassignable, and this rule has been applied to actions for fraud and deceit ..." <u>All States Life Ins. Co. v. Jaudon</u>, 154 So. 798, 799 (Ala. 1934).

The sufficiency of one of the claims made by Second Avenue in Count One of its complaint pursuant to 11 U.S.C. § 727(a)(2) is likewise questionable. It contends that Mr. Latimer should be denied a discharge because he purportedly:

> transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed property, in the form of rents received from the Real Property, that belonged to the Defendant within one (1) year prior to the Petition Date with the intent to hinder, delay, or defraud the Defendant's creditors, including the Plaintiff, within the meaning of Section 727(a)(2) of the Bankruptcy Code.

A.P. Doc. No. 1.

Section 727(a)(2) provides that:

> The court shall grant the debtor a discharge, unless--
>
> > **...**
> >
> > (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed--
> >
> > > (A) property of the debtor, within one year before the date of the filing of the petition; or
> > >
> > > (B) property of the estate, after the date of the filing of the petition ....

11 U.S.C. § 727(a)(2).

Second Avenue's allegation tracks 727(a)(2)(A). It does not claim that Mr. Latimer transferred, etc. property of the estate after he filed his bankruptcy estate. Instead, it claims that he transferred his property, with the prerequisite intent, before filing bankruptcy. Problematic to that claim is the fact that Mr. Latimer filed bankruptcy on January 17, 2011. The alleged conversion of rents did not take place until after April 18, 2011. Section 348(a) of the bankruptcy code provides that while, "Conversion of a case from a case under one chapter of this title to a case under another chapter of this

31

title constitutes an order for relief under the chapter to which the case is converted ...," it "does not effect a change in the date of the filing of the petition, the commencement of the case, or the order for relief." 11 U.S.C. § 348(a). Since, by virtue of that code section, Mr. Latimer's conversion of his case to chapter 7 on August 12, 2011, did not effect a change in the date of the filing of the petition, his purported transfer of property after January 17, 2011, could not possibly qualify as a transfer, etc. of "property of the debtor, within one year before the date of the filing of the petition."

Also in Count One of its complaint, Second Avenue contends that Mr. Latimer should be denied a discharge because he purportedly, "concealed, destroyed, mutilated, falsified, or failed to keep or preserve recorded information, including books, documents, records, and papers from which the Defendant's financial condition or business transactions might be ascertained, within the meaning of Section 727(a)(3) of the Bankruptcy Code." Section 727(a)(3) provides that:

> (a) The court shall grant the debtor a discharge, unless--
>
> ...
>
> (3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case ....

11 U.S.C. § 727(a)(3).

The onus is on Mr. Latimer to satisfy the requirements of that code section. Therefore, any difficulty in performing that duty which may result from a stay of this adversary proceeding will fall on him and not Second Avenue. Consequently, Second Avenue has no apparent basis for contending that its 727(a)(3) cause of action may be prejudiced by any delay in prosecuting it that may result from the stay of the present matter.

The Court is not prejudging Second Avenue's case. However, the fact that the language of its complaint is currently insufficient on its face to support the relief which it seeks, detracts from concerns that it will actually suffer any prejudice as a result of being required to await the outcome of the arbitration to prove those claims.

The Court is also not abdicating its responsibility to decide either the dischargeability issues raised in Second Avenue's complaint or its objections to Mr. Latimer's discharge. A stay of this proceeding is warranted, however, so that issues with respect to the claims made by Mr. Latimer which are currently in arbitration may be

32

resolved. Those issues are germane to the present case and could result in resolution of the same by way of recoupment or otherwise. Staying this action will serve the purpose of avoiding duplicitous litigation since Mr. Latimer will otherwise have to raise and try the arbitrable issues in this case as a matter of self defense, and in the arbitration proceeding as well. Such a conundrum would not only result in prejudice to him in the form of additional expense, time, attention, and effort, but will also needlessly consume the valuable and limited resources of this Court which could otherwise be better spent attending to other litigation. Moreover, the imminent danger of conflicting decisions about the same issues could result in unnecessary confusion and unjust results. On the other hand, the Court cannot imagine what prejudice will result Second Avenue by the imposition of a stay. It's progenitors will have to participate in the arbitration anyway. And it has not suggested that whatever evidence it needs to prove its case is likely to disappear before that proceeding is finished.

### E. Scope of the Stay

Having decided a stay is warranted, the scope of the stay must next be addressed and established. The creed of <u>Landis</u> is moderation. However, each of the three cases discussed above, in which the parallel proceeding was an arbitration, indicated that a federal court has the power to stay an action involving nonarbitrable issues until a parallel arbitration proceeding is through. "Our recognition of the right of objectors to proceed directly to court does not detract from district courts' discretion to defer discovery or other proceedings pending the prompt conclusion of arbitration." <u>Air Line Pilots Ass'n v. Miller</u>, 523 U.S. 86, 879 n.6 (1998). "In some cases, of course, it may be advisable to stay litigation among the non-arbitrating parties pending the outcome of the arbitration." <u>Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.</u>, 460 U.S. 1, 21 n.23 (1983). "When confronted with litigants advancing both arbitrable and nonarbitrable claims... courts have discretion to stay nonarbitrable claims." <u>Klay v. All Defendants</u>, 389 F.3d 1191, 1204 (11th Cir. 2004).

Having the issues decided by the arbitrator is the desired objective. And that is not accomplished unless the case involving the nonarbitrable issues is stayed until the arbitration is finished. And if that is not accomplished then neither is the goal of avoiding duplicative litigation. Those cases appear, therefore, to set a baseline rule that, if a stay is warranted, the duration of the arbitration is by definition moderate and definite. In other words, if that is what it takes to get the issues decided by arbitration, then nothing less will necessarily do. Part of an arbitration will not get it done.

Nevertheless, the Court is mindful of the admonishment of <u>Landis</u>, and acutely concerned with what impact the stay in this case may have on Second Avenue as time goes on. Therefore, it intends to keep tabs on the arbitration, with the help of the litigants in this case, and endeavor to ameliorate any deleterious effect of the delay which may arise if that proceeding does not proceed in a reasonably prompt manner.

Second Avenue asserted that its primary concern is discovery and asked for discovery to proceed in this case.  But the Court is concerned that allowing discovery to proceed simultaneously in this proceeding and in the arbitration will create a potential source of conflict between the arbitrator and this tribunal.  Moreover, at the hearing of this matter, Second Avenue, while expressing its concern over having its discovery efforts delayed, did not convince the Court that a delay in obtaining discovery will ultimately be prejudicial to its case.  And it admits that discovery will be available in arbitration, although it was, at that point in time, not available because of nuances associated with that particular proceeding.  Furthermore, the possibility of discovery going forward in this case, and possibly other pretrial activities, can be revisted, and the stay modified accordingly if the arbitration does not proceed expeditiously.

Second Avenue expressed, in particular, at the hearing of this matter, its dissatisfaction with what it considers efforts by Mr. Latimer to avoid discovery.  Of course, it may make that argument to the arbitrator should it occur during the course of the arbitration.  However, it should be made clear that this Court will look askance at any intentionally dilatory actions taken by either party during the arbitration in an effort to delay or impede the progress of the same.

While it is the intention that the stay of this proceeding last until the arbitration proceeding has concluded, the Court will set a status conference in three months, and at the end of each three month interval thereafter.  At that time, and at any such succeeding status conference, the parties may report on the progress of the arbitration, or lack thereof, and express their displeasure, if any, with the same or recommendations with respect to going forward.  If the arbitration is not proceeding in a relatively expeditious manner, the Court will entertain motions to alter the stay in a manner that will alleviate any prejudice resulting from that proceeding's lack of progress.  In that way the Court can keep its fingers on the pulse of the arbitration, and evaluate the continued necessity of the stay in its present form in light of the circumstances existing at any such point in time.

An Order will be entered contemporaneously with this Memorandum Opinion.

Dated: March 26, 2013                    /s/Benjamin Cohen_____
                                         BENJAMIN COHEN
                                         United States Bankruptcy Judge

BC:sm

Case 11-00432-DSC    Doc 48    Filed 03/26/13    Entered 03/26/13 14:30:49    Desc Main
Document    Page 34 of 34